THE CITY OF HARTFORD *vs.* THE COUNTY OF HARTFORD.

*A sta e-house was erected at Hartford in 1796, upon land belonging to the town of Hartford, the cost being paid by the state, by the county of Hartford and by citizens of Hartford, the state paying something over half. The building was thenceforth used by the state for state offices and for the sessions of the General Assembly, by the county for its courts, and by the city and town of Hartford for city and town purposes. The city ceased to occupy in 1830, and the town in 1832, but the state continued to occupy until the completion of a new state-house upon another site in 1878, while the occupancy of the county still continued. In 1878 the town, and in 1879 the state, conveyed to the city all their respective rights and interests in the property. Held—*

1. *That the interests of the state and county were an equitable interest in the building, each occupying in severalty a particular portion and neither having the right to disturb the other in the possession of its portion.*
2. *That the city, by obtaining a conveyance of the rights of the state, acquired therefore no right to disturb the county in its possession and use.*
3. *That the interest of the town was merely a title to the land, subject to the equitable rights of the state and county.*
4. *That the use of the building by the state and county must be regarded as under an agreement with the town or by its consent, so that no title to the land had been acquired by adverse possession.*
5. *That this equitable right or easement on the part of the state and county continued so long as each pleased to continue its occupancy for the same purposes.*
6. *That the rights of the city (acquired by a conveyance from the town) were therefore a title to the land and building, subject to the remaining easement in the county.*

EJECTMENT; brought to the City Court of the city of Hartford. The demanded premises were a part of a building standing on State House Square in the city of Hartford,

City of Hartford v. County of Hartford.

and which was originally built as a state-house and court-house. The case was referred to a committee by whom the following finding of facts was made :—*

It does not appear, nor is it claimed, that the county of Hartford has by virtue of any recorded deed or grant a title to any part of the land in the city of Hartford, called State House Square, on which the old state-house stands. The city of Hartford derives its title to the land in question from a deed of quitclaim by the town of Hartford, dated December 26th, 1878, duly executed, made in pursuance of a legal vote according to the customary mode of disposing of public lands in that town.

The town of Hartford having acquired an equitable title by purchase from the aborigines, had its legal title confirmed and established by a patent from the Governor and Company of the Colony of Connecticut, dated May 26th, 1685, which patent was confirmed by an act of the General Assembly of the colony in May, 1703. The title of the Governor and Company of the Colony of Connecticut was from the royal charter granted by King Charles II. in 1652.

Whatever interest the state of Connecticut had in the old state-house and its appurtenances was conveyed to the city of Hartford by Alfred E. Burr, president of the Board of Capitol Commissioners, by deed dated June 27th, 1879. This deed was made in pursuance of two resolutions of the General Assembly, one approved July 17th, 1871, the other March 28th, 1879.

Before the building of the first state-house the General Assembly and other courts ordinarily sat in a chamber called the Court Chamber, in the first meeting-house in Hartford, situated on the southeast part of what has since been State House Square, and built, so far as appears, at the sole charge of the town of Hartford. In 1715 an order

* The committee in this case was Charles J. Hoadley, Esq., the State Librarian, who is widely known for his antiquarian researches and knowledge. As the report contains so much of interesting history the Reporter has given it in full, though some portions of it might have been omitted as not essential to the case.

was passed by the deputy governor and council for repair-
ing this chamber at the colony's charge.

In October, 1717, an act of the General Assembly was
passed, reciting that it appeared very necessary that con-
venient houses for the sitting of the General Assembly and
other courts be provided, and ordering that a quantity of
the ungranted lands be sold to procure £1,500, whereof
£650 was to be improved towards a state-house in Hartford,
and £300 each to the other counties, New Haven, New
London and Fairfield, for court houses.

Nothing was done under this act, but in October, 1718,
£500 was allowed by the General Assembly for the build-
ing of a state-house in Hartford.

In October, 1719, the dimensions of the building were
agreed upon, and it was ordered that the county of Hartford
should pay towards the finishing of the state-house, if it
should be requisite, the sum of £250. Accordingly, for this
purpose, and as it was empowered to do by the General
Assembly, the Hartford County Court in February, 1719,
ordered a tax or rate of a half-penny on the pound to be
laid on all the polls and ratable estate within the county.
The same building is in the records sometimes called the
state-house and sometimes the court-house. Reference is
made to the courts held in the court-house in Hartford, in
an act of the General Assembly, May session, 1724.

Besides its use for the General Assembly and other courts;
town meetings were usually held in the building, as appears
by the records of the town. In the charter of the city of
Hartford, granted in May, 1784, the first city court was
ordered to be held in the state-house in said city, with this
further provision :—" and the city court of said city may be
holden in said state-house from time to time, or in such
other place as said city shall provide." The charter also
provided that the first city meeting should be held at the
state-house, and a by-law of the city approved February 22d,
1785, ordained that the annual city meeting should be
there held.

The building was also used for other purposes. The

First Ecclesiastical Society held religious exercises there from 1737 to 1739, while their new meeting-house was in building.  It was used for divine services by the Episcopalians from time to time between 1762 and 1795, before they had a church.  Members of the junior class of Yale College acted a play in the court-house on the Monday evening of election week, May, 1778.

The cost of repairs of this state-house and the pay of the door-keeper of the court-house were defrayed, two thirds from the treasury of the colony of Connecticut and one third from that of the county of Hartford.

At a session of the General Assembly holden at Hartford in May, 1792, it was resolved—

" That John Chester, John Caldwell, John Trumbull, Noadiah Hooker and John Morgan, be appointed a committee to superintend the business of erecting and finishing a large, convenient state-house in the town of Hartford, to accommodate the General Assembly of this state, and for other uses; the same to be built of brick, and upon the following conditions, viz.: the inhabitants of the city, town and county of Hartford are to raise and pay into the hands of said committee the sum of £1,500 lawful money by the first day of May, 1793, to be applied by said committee towards erecting and finishing said building; and in case the said sum should be raised and paid over, or secured to be paid, as is above expressed, then the said committee are hereby authorized and impowered to draw from the treasury of this state a sum not exceeding £1,500, to be applied by them to the same purpose; likewise to sell, at auction or otherwise, the state-house standing in said town of Hartford, and to vest the avails thereof in the new building to be erected as aforesaid; and that the committee make their contracts in the premises for money only."

A subscription paper was accordingly circulated among the inhabitants of the city and town of Hartford, the original of which, with the signatures of the subscribers and the amounts by them severally subscribed, may be seen in the rooms of the Connecticut Historical Society.  The heading of the subscription paper is as follows:—

"The subscribers do engage to pay into the hands of Messrs. John Chester, Noadiah Hooker, John Trumbull, John Caldwell and John Morgan, when requested, the several sums of money annexed to their names, to be appropriated by the above named persons in erecting and finishing a state-house in the town of Hartford.   June 1, 1792."

The major part of the assistants and justices of the peace in the county of Hartford, being met together, laid a tax upon the inhabitants of the county to aid in defraying the cost of the building, as appears by the record in the office of the clerk of the Superior Court; the most material part of which record is as follows:—

"At a meeting of the Civil Authority in the county of Hartford in the state of Connecticut, holden at Hartford in said county on the second Tuesday of August, Anno Dom. 1792,

"*Voted,* That a tax of one-half penny on the pound be laid upon the polls and ratable estate of the inhabitants of the county, on the list of 1791, to be collected and paid into the treasury of the county by the first day of February next, for the purpose of contributing a reasonable proportion to build a state and county house, upon the plan proposed by the General Assembly in their resolve passed at their session holden at Hartford in May last; and that the treasurer of said county be, and he is hereby directed to issue his warrants for collecting said tax, directed to such collectors as may be appointed agreeably to law to collect the same."

The sum of five thousand dollars, which is the equivalent of fifteen hundred pounds lawful money, was actually raised and paid by the inhabitants of the city, town and county of Hartford towards the building of the state-house.   In the first instance the state paid for the purpose $5,000; the citizens of Hartford raised by subscription $3,500; and the county of Hartford paid about $1,500; making together $10,000.

·Further sums were afterwards paid by the state to defray the cost of the building.   This appears from a report of a

committee of the General Assembly made to that body at the October session of 1796. What amount, if anything, was realized from the sale of the old state or court house does not appear.

No action of the town with regard to the subject appears to have been taken at the time of building either of the two state-houses referred to.

When the building was ready for occupancy in 1796, the new state-house continued to be used for the same purposes as its predecessor had been, as also for the executive offices of the state government, for which accommodations had not been provided in the old state-house. It was used for city purposes until 1830. Town meetings continued to be held there until 1832, and in later years the Representatives' Chamber is specified on the records as the particular part of the building in which they were held. It was occupied without interruption for holding the various courts of the county :—the County Court until its abolition in 1855, the Supreme Court of Errors until 1878, and the Superior Court to the present time.

In May, 1822, a resolve was passed by the General Assembly, reciting that the city and county of Hartford had granted $300 for the purpose of procuring a bell to be fixed upon the state-house at Hartford, and authorizing the comptroller and the sheriff of the county of Hartford, at the expense of the state, so soon as such bell should be procured without cost to the state, to put up the bell with a suitable cupola surrounded and properly supported, provided the expense did not exceed the sum of $300.

The cost of repairing that portion of the building occupied by the county has been defrayed from time to time from the county treasury.

Upon these facts the case was reserved for the advice of this court.

*C. E. Perkins*, for the plaintiffs.

*J. R. Buck*, for the defendants.

CARPENTER, J.   We think it quite clear that neither the state nor the county gained any title to the land in question by possession.   Neither of them claimed any title to the land, and in neither of them was the possession adverse to the rights of the town.

The town, and afterwards the city, which included doubtless a large majority of the tax payers of the town, used the first state-house for about seventy-five years, and the present building for over thirty-five years, without objection, although both buildings were erected mainly by the state and county.   It may fairly be inferred that the town, in consideration of its ownership of the land, was permitted to use the building for municipal purposes; and that the building, in consideration of such use, was allowed to be constructed and to stand upon the land of the town.   Why the town abandoned the use of it does not appear; but as that was within the memory of living witnesses, we may well suppose that it was not on account of any objection by state or county.   If there had been any ejection by legal process or otherwise, an event of that importance would certainly have been shown.   Perhaps it is not unreasonable to suppose that the growth of the town rendered the accommodations inadequate, and compelled them to seek accommodations elsewhere.   Whatever may have been the reason, we see no indication that the character of the possession was at all changed.   There was no notice of a surrender of a lease, no disclaimer of holding under a license, and no claim that the possession was to be thereafter under a claim of title to the land; but, so far as we know, the possession continued on the same terms as before.   Consequently there was no time when there was a disseizin, and no time when the town for any reason could maintain an action of ejectment.   Swift's Digest, vol. 1, p. 162, says:—"It is essential that the possession should be adverse to the right of the owner, and that the possessor should hold the land claiming it as his own and denying the right of everybody else. There must be an ouster or disseizin of the owner, so that he could have a right of action to recover the possession;

but where a person enters into possession by license and consent of the owner, or holds it by his consent, recognizing his right, as by a lease parol, such possession is not adversary but, in construction of law, is the possession of the owner; and let it continue ever so long, it will not defeat his title."

This language is exactly adapted to this case. We conclude then that the real title to the land, as well as the record title, is in the city.

Has the county any right or interest in the building? In other words, can the city deprive the county of its use?

As the city has the rights of both the state and the town, the question proposed involves a consideration of the relations of the county to the state and to the town.

First, as to the state. We have seen that neither had any title to the land. Both had an equitable interest in the building; they in fact owned it in equity so long as they continued to use it for the purposes for which it was constructed. The rights of each were equal in their nature and character, differing only in degree. They were in a sense co-tenants of the building, not occupying as joint tenants, but each occupying separate portions in severalty. The state could no more interfere with the county than the county could with the state. Each contributed to the erection of the building, and each as against the other had a right to the use of a reasonable portion of it. The city therefore acquired no right from the state to deprive the county of that use.

What right did the city acquire by its deed from the town? Simply the record title to the land, subject to such an easement as the county had. The easement of the state by its deed to the city was merged in the legal title. The easement of the county remained. What was its nature and extent? We answer, the right to have the building stand on the land, that the county might use that portion of it which it had been accustomed to use for county purposes as long as it pleased. This right or easement in our judgment may well rest upon either one of two grounds

—prescription or estoppel. There was an implied agreement that the land might be used as a site for a state and court house. Pursuant to that agreement the state and county entered and occupied it for more than one hundred and sixty years. And if the use of the building by the town and city be regarded as a sort of ground rent, still there remains nearly fifty years that no such rent was received; and the occupancy of the land has been without question or hindrance.

Under these circumstances, and after the erection by permission of the town of so costly and substantial a building as the present one is, it may well be supposed, a contrary supposition being wholly inadmissible, that the state and county claimed a right to use the land as they have used it. ·Here then are all the elements of a prescription—a user under a claim of right, acquiesced in by the owners of the land for more than fifteen years. This usage however, which is supposed to be founded on a grant or agreement, determines the nature and extent of the supposed grant; for the right granted will be considered to be commensurate with the right enjoyed, and that is, the right to use the land as a site for a state and court house, and for no other purpose. 1 Swift Digest, 159.

We have said that this right may also rest upon an estoppel. The county expended its money on land of the town to provide a building for county purposes, with the knowledge and by the consent of the town. There was at least an implied agreement of some kind. The state and county did not become tenants at will or by sufferance—a tenancy that could be terminated at the pleasure of the town. It must have been understood by all the parties that the arrangement was a permanent one; it was not for a year or for a term of years, but, so far as could then be foreseen, it was for all time. The town, by permitting the erection of a structure of that character and for those purposes, would be clearly estopped from preventing its use for the purposes for which it was intended. And how long was that estoppel to continue? Just so long as the parties

intended that the land should be so used—presumptively at the pleasure of the state and county. There is no other rule by which we can limit its operation. The state has determined its pleasure and abandoned the use of the building. The county has not as yet done so. Until it does it cannot be deprived of its right to use it.

Judgment is advised for the defendant.

In this opinion the other judges concurred; Judge CULVER of the Superior Court sitting in the place of Judge PARDEE.